REAL ESTATE TITLE INSURANCE & TRUST CO. v. LEDERER, Internal Revenue Collector.

(Circuit Court of Appeals, Third Circuit.  February 9, 1920.)

No. 2113.

INTERNAL REVENUE ⊂⇒9—EXCISE TAX ON BANK "CAPITAL USED AND EMPLOYED BY BANK" HAVING DIFFERENT DEPARTMENTS STATED.

    A corporation having four departments of business, title insurance, trust, safety deposit, and real estate, keeping the business of each department separate, and investing its capital, surplus, and undivided profits, aside from the amount invested in its title plant and building, in permanent securities, which added banking as a fifth department, using therein only the deposits received, *held* not taxable on its entire capital, surplus, and undivided profits under Act Oct. 22, 1914, § 3, imposing an excise tax of $1 for each $1,000 of capital "used or employed" by bankers, but only on such capital, if any, as was used or employed in its banking department, the fact that all of its capital would be liable for losses in that department not being determinative.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action by Real Estate Title Insurance & Trust Company against Ephraim Lederer, Collector of Internal Revenue for the First District of Pennsylvania. Judgment for defendant, and plaintiff brings error. Reversed.

For opinion below, see 229 Fed. 799.

Maurice Bower Saul, of Philadelphia, Pa., and John G. Johnson, of Oneonta, N. Y., for plaintiff in error.

Francis Fisher Kane, U. S. Atty., and Robert J. Sterrett, Asst. U. S. Atty., both of Philadelphia, Pa. (Gordon Auchincloss, Sp. Asst. U. S. Atty., of New York City, of counsel), for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and MORRIS, District Judge.

BUFFINGTON, Circuit Judge.  In the court below the plaintiff brought suit against the defendant, collector of internal revenue, to recover taxes alleged to have been unlawfully collected. On trial that court, after hearing the plaintiff's proofs, granted a peremptory nonsuit. On its refusal to take off such nonsuit, plaintiff appealed.

The question here involved is the construction of the Act of October 22, 1914, c. 331, § 3, 38 Statutes at Large, 750, which provides:

"Bankers shall pay $1.00 for each $1,000 of capital used or employed, and in estimating capital, surplus and undivided profits shall be included.  The amount of such annual tax shall in all cases be computed on the basis of the capital, surplus, and undivided profits for the preceding fiscal year. Every

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

person, firm, or company, and every incorporated or other bank, having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check, or order, or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange, * * * or where stocks, bonds, bullion, bills of exchange, or promissory notes are received for discount or sale, shall be a banker under this act: Provided, that any postal savings bank, or savings bank having no capital stock, and whose business is confined to receiving deposits and loaning or investing the same for the benefit of its depositors, and which does no other business of banking, shall not be subject to this tax."

The proofs in this case which the court below declined to submit to the jury, tended to show that the plaintiff in this case was a corporation of the state of Pennsylvania, which had been formed in 1876. It was originally incorporated solely for the purpose of insuring titles to real estate. At that time its capital of $250,000 was paid in in cash, and that capital was used in preparing a title plant. This branch of its business has grown to large proportions, and between $400,000,000 and $500,000,000 of title insurance has been issued. From that time to the present its title business has been kept separate and distinct from its other operations, not only as a bookkeeping and accounting proposition, but in its documents, data, and details. The larger part of the company's business has always been and still continues to be the insurance of titles. Its present capital is $1,000,000, surplus $1,500,000, undivided profits $128,000, of which sum $1,000,000 was paid in, in cash, and the other has been the accretion of profits. The proofs show that of these sums about $143,000 was invested in its title plant, $400,000 in its building, and that the rest, with a few slight exceptions, is invested in permanent securities.

In 1881 the Title Company embarked in the trust business, changing its name from the Real Estate Title Insurance Company to that of the Real Estate Title Insurance & Trust Company, and its original capital of $250,000 was then increased to $250,000 more of fully paid-in capital. The trust business continued to be and was, after its title business, the next largest part of its business, its trust assets now amounting to about $13,000,000. Such trust business has always been kept separate and distinct from the company's title business, and, as other departments were added, it has always been kept separate and distinct from them, also. Moreover, its trust assets have been segregated and individualized, as belonging to its cestuis que trustent. The company subsequently added two other departments—a safe deposit, in which they rented safes and received valuables on deposit, and also a real estate department, which buys, sells, rents, and collects the rents of real estate. The business of all these four departments is kept separate and distinct, and when any money is received for services rendered in either of said departments it is deposited in the Corn Exchange National Bank. From these businesses they have from time to time made earnings, which have been carried to surplus and undivided profits, and purchases have been made of bonds, stocks, and permanent investments, and the testimony is that, from its books and accounts, the company is able to say from what account every investment they have has been made. Later on the company added a bank-

ing department, which does a business of approximately $4,000,000, which business is done with the funds deposited with them in banking accounts. Such deposits are received in the banking department of the trust company's establishment, and at the close of the business day they are redeposited by the trust company in one of four banks in Philadelphia and one in New York City, and no part of the depositor's money is carried to the account in the Corn Exchange Bank, in which bank the trust company keeps the funds used in and accruing from its other departments. From the standpoint of present earnings, the proofs tended to show that the banking department bore a relation of about one-fifth to the other departments of the trust company's business.

With these proofs before it, given by the accounting officers of the bank, and about which we do not understand there is any dispute, the question was asked of a witness by the trust company's counsel, "State how the capital, surplus, and undivided profits of the company were invested during the taxable period," to which question, as well as to several other substantially like questions, the court sustained an objection. We are unable to agree with this ruling of the court. The answer to that question, and the kindred questions, was the very crux of the case, and this experienced witness was best constituted to answer such questions and give his reasons therefor. Whether his testimony was correct was, of course, a matter for the jury to pass upon, and whether he drew correct inferences from his facts was for the jury to say as to whether this permanently invested capital, surplus, and undivided profits, which was segregated and kept separate from the money employed by the company in its banking business, was in any way used or employed in the banking business, if the evidence when given tended to show such banking use. Of course, these permanent investments formed part of the assets of the company as a whole, and, in case the company's banking operations proved unsuccessful, those assets would eventually have to contribute toward making up the losses of the depositors. But this fact of ultimate responsibility of all the company's assets for all the company's liabilities did not, in our judgment, constitute of itself a use or employment of those securities in the banking business for the taxing year. No such losses had occurred, and no such use or employment of its assets in other departments was made by the company in its banking operations. To that situation the remarks of Judge Lacombe, in 171 Fed. 302 (Central Trust Co. of New York v. Treat), are applicable:

"The evidence shows that the entire amount of these undivided profits before, during, and at the end of the fiscal year were invested in municipal and railway bonds and in the stocks of corporations, and were not in any sense employed in the business of banking, although the ownership of this large amount of securities available to make good losses in any of the enterprises which the corporation was conducting naturally increased its credit generally."

As we have said, the plaintiff trust company, by virtue of corporate powers thereto enabling it, is, besides banking, engaged in four other distinct businesses: First, insuring titles; second, executing trusts; third, safe deposit; and, fourth, real estate—and in carrying such title,

trust, safe deposit, and real estate businesses the plaintiff does none of the several acts which the statute defines as constituting banking; that is to say, it does not receive deposits, make collections, loan money, or discount or sell notes. From which it will appear that, if the plaintiff company were only carrying on, first, its title insurance business; second, its trust business; third, its safe deposit; and fourth, its real estate business—it would not be subject to tax under this act, as being engaged in the banking business. Such being the undoubted fact, does the further fact that plaintiff adds a fifth business, viz. that of banking, to its corporate acts, thereby subject to the taxing scope of this act not only "$1 for each $1,000 of capital used or employed" in its banking business, but also for "each $1,000 capital" employed, first, in its title business; second, in its trust business; third, in its safe deposit; and, fourth, in its real estate business. We think the statement of such proposition is of itself an answer to the contention; and this for the reason, first, the act by its terms does not impose a tax on the capital or surplus used or employed in title, trust, safe deposit, or real estate business; second, the act not expressly imposing a tax on such title, etc., businesses, such tax cannot be imposed by implication, for the authorities are uniform that taxes, being a statutory burden imposed by the government on the citizens, they must have express statutory warrant; and, lastly, the words of this statute must be regarded as used by Congress in the meaning given to them in an unchallenged prior judicial decision.

This third point brings us to a consideration of the Spanish-American War Tax Act of June 13, 1898 (30 Statutes at Large 448), which is printed in the margin.[1] In 1909 the construction and application of that statute to a company engaged in both the banking and trust business came before the United States Circuit Court for the Southern District of New York, in a case reported in 171 Fed. 302 (Central Trust Co. of New York v. Treat), wherein Judge Lacombe said:

"In the case at bar the plaintiff [a trust company] is not a bank or banker, and, although it does some of the things enumerated in the section as indicative of such business, its principal business seems to be distinctively that of a trust company. It will be observed that the 'capital and surplus,' which is subjected to the tax, is that which is used or employed by the banker; i. e., in the banking business. The evidence shows that the entire amount of these

---

[1] "Bankers using or employing a capital not exceeding the sum of twenty-five thousand dollars shall pay fifty dollars; when using or employing a capital exceeding twenty-five thousand dollars, for every additional thousand dollars in excess of twenty-five thousand dollars, two dollars, and in estimating capital surplus shall be included. The amount of such annual tax shall in all cases be computed on the basis of the capital and surplus for the preceding fiscal year. Every person, firm, or company, and every incorporated or other bank, having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check, or order, or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange, or promissory notes, * * * are received for discount or sale, shall be a banker under this act: Provided, that any savings bank having no capital stock, and whose business is confined to receiving deposits and loaning or investing the same for the benefit of its depositors, and which does no other business of banking, shall not be subject to this tax." Section 2, subd. 1.

undivided profits before, during, and at the end of the fiscal year were invested in municipal and railway bonds and in the stocks of corporations, and were not in any sense employed in the business of banking, although the ownership of this large amount of securities available to make good losses in any of the enterprises which the corporation was conducting naturally increased its credit generally."

This summary of the evidence made by Judge Lacombe and his conclusion therefrom that the undivided profits of the trust company which "were invested in municipal and railway bonds and in the stocks of corporations" were not taxable as being used or employed in banking, although "the ownership of this large amount of securities available to make good losses in any of the enterprises which the corporation was conducting naturally increased its credit generally," was embodied in his opinion, as we have seen from the extract above quoted, and his findings were by him directed to be prepared by counsel, submitted, and signed. On review by the Circuit Court of Appeals, the decision was affirmed in an opinion reported in 185 Fed. 762 (Treat v. Farmers' Loan & Trust Co.); the court holding:

"The questions for consideration are whether the capital and surplus of either of the plaintiff companies were subject to the tax and whether interest and costs or either were properly awarded against the defendant. The agreed statements show that the capital and surplus of both companies are permanently invested in stocks and bonds; that the only business the companies do as bankers within the definition of banking in the Act is the opening of credits by deposits or collections of money and paying the same out on check, draft, or order and the loaning of money on stocks, bonds, or secured paper. This business is done entirely by means of the depositors' moneys. As the act only taxes the capital and surplus used or employed in banking, we think the Circuit Judge was entirely right in holding as matter of law that the plaintiffs, not using their capital or surplus in banking, were not subject to the payment of any tax thereon. No doubt they got credit by the amount of their capital and surplus, but Congress evidently intended to put corporations upon the same basis as individuals, and it would obviously be very unfair to tax an individual upon his whole fortune because he was using a part of it in the banking business."

The government made no effort to review this decision in the Supreme Court, and consequently, when the present act was passed, Congress had before it a final decision by a court of last resort, which construed the words "bankers using or employing capital" as not extending to that part of the capital or surplus of a trust company which was invested in its trust business and was not employed in its banking business. With that decision of record, Congress in preparing the present act, and using substantially the same words, viz. "Bankers shall pay $1 for each $1,000 of capital used or employed," we think should be deemed to have used such words in the light of the decision of the Circuit Court of Appeals, and with the purpose of taxing, not all capital, but the capital "used or employed" by the banker who and whose banking operations were defined by the act. But over and beyond this, to our mind, these words "used or employed" were used and employed by Congress in the ordinary, common acceptation of these words, and so considered they limit capital generally and restrict taxation to "capital used or employed" in banking. Moreover, we think that, a prior decision on the construction of those words in

the prior act being in force when this later statute was passed, it would seem that the spirit and intent of that decision should be carried into the present act so as to harmonize and maintain that continuity and conformity of tax decisions which is highly desirable in the construction and application of tax statutes.

Such being the construction of the statute, it follows that the question to be determined in the present case is one of fact, namely, whether any part, and, if so, how much, of the trust company's capital, surplus, and undivided profits was really used or employed in those specified business operations which the act defines as constituting banking. Manifestly, the money used by the plaintiff company in its banking operations was the money deposited with it by its customers; and it would seem clear from anything that now appears that no banking use was made of the capital, surplus, and undivided profits, which were located and segregated in its title, trust, safe deposit, and real estate department. Such being, in our view, the proper construction and application of the statute, it follows the court below was in error, in overruling the question—and those of like tenor—quoted, in view of the testimony in the case, and granting a compulsory nonsuit.

We may say further, that our construction of this statute is in our view in accord and not at variance with the decision of the Circuit Court of Appeals of the Second Circuit, in Anderson v. Farmers' Trust Co., 241 Fed. 328, 154 C. C. A. 202; for, while the decision of the lower court was in that case reversed, the ground for such reversal was the lower court's failure to put the burden of proof on the plaintiff. But the real significance of the case, so far as the construction of the statute is concerned, was that the tax could not be upheld on that part of the trust company's capital, surplus, or undivided profits which were not used or employed in banking.